**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

Civil Action No. 21-12383
HON. JONATHAN J.C. GREY

NORMAN RHODES, JEANNIE K. PARKER-RHODES, JULY THIRTYFIRST, and COUNTY OF ST. CLAIR,

Defendants.
_______________________________/

**AMENDED ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 79)**

## I. INTRODUCTION

Plaintiff United States of America (the "United States" or "government") filed this two-count action seeking:

A. to recover from defendant Norman Rhodes ("Rhodes") federal income tax liabilities for the periods ending December 31, 2003 through December 31, 2008, in the amount of $558,352.96, plus statutory additions and interest accruing from and after March 20, 2021, including interest pursuant to 26 U.S.C. §§ 6601, 6621, and 6622, and 28 U.S.C. § 1961(c);

B. a determination that the United States has valid and subsisting federal tax liens under 26 U.S.C. §§ 6321 and 6322 securing the liabilities described in paragraph A on 3206 South Channel, Harsens Island, Michigan 48028 (the "Real Property"); and

C. an order enforcing the federal tax liens securing the liabilities described above pursuant to 26 U.S.C. § 7403 against the Real Property by ordering the sale of the entire Real Property in a judicial sale (including by a receiver if requested by the United States), free and clear of all rights, titles, or interests of the parties, including any rights of redemption, with the proceeds of the sale distributed, in order: (1) to pay the costs of the sale, including any expenses incurred to secure and maintain the Real Property; (2) to the defendant St. Clair County, Michigan, to pay any real estate taxes due and owing which are entitled to priority under 26 U.S.C. § 6323(b)(6); and (3) to the United States to pay the liabilities described in paragraph A, except to the extent that the Court determines that another party has a superior claim, lien, or interest.

(ECF No. 1, PageID.9–10.) On October 9, 2024, the United States filed a motion for summary judgment against all defendants.[1] (ECF No. 79.) The

[1] Defendant St. Clair County, Michigan, was joined as a party to this action because it has, or may claim during the pendency of this action, a lien on the Real Property arising from the nonpayment of property taxes. (ECF No. 12, PageID.50 at ¶ 2.) As set forth in the parties' stipulated order:

> In the event the Court orders that the federal tax liens be enforced through a judicial sale of the real property at issue, then the United States shall provide defendant St. Clair County, Michigan, with advance notice of any such sale and will request that the Court order the sale proceeds to be distributed first to pay the costs of the sale and next to satisfy any real property taxes and/or special assessments due with regard to the property that are entitled to priority over the federal tax liens pursuant to 26 U.S.C. § 6323(b)(6), with the remainder of the sale proceeds to be distributed to the other parties to this action in accordance with their lawful priorities. Provided, St. Clair County retains the right to challenge, contest or make requests regarding determinations impacting liens asserted by St. Clair County, including, but not limited to, concerning: priority, perfection, amount, payment, satisfaction, release and/or termination.

(*Id.* at ¶ 5.)

Court finds that the parties have fully and adequately briefed the motion,[2] and the Court therefore considers it without oral argument. E.D. Mich. LR 7.1(f). For the reasons set forth below, the motion for summary judgment is **GRANTED**.

## II. BACKGROUND

In 1980, Rhodes started a graphic design company called "Rhodes Graphics," a Michigan corporation. (ECF No. 79-1, PageID.797 at 34, 38.)

---

[2] On November 5, 2024, Brent Emory Johnson, who is not a party to this action, filed an "Objection to Motion for Summary Judgment." (ECF No. 83.) As Mr. Johnson is not a party or a licensed attorney, he does not have standing or the right to file an objection to the motion for summary judgment. As discussed herein, Mr. Johnson allegedly is affiliated with July ThirtyFirst as its "fiduciary owner," but that relationship also does not entitle him to file pleadings in this action. As the Court, through the then-presiding judicial officer, the Honorable George Caram Steeh, previously ruled:

> In any event, assuming that July Thirtyfirst is a legitimate entity, **<u>Johnson may not appear on its behalf in federal court</u>**. Although an individual may litigate his own case in federal court, entities such as corporations, associations, or trusts must be represented by a licensed attorney. Rowland v. California Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 202 (1993); Keyway Leasing Tr. v. United States, 1999 WL 810386, at *1 (W.D. Mich. Aug. 26, 1999) ("The rationale for the rule requiring artificial entities to appear before the federal courts only through licensed counsel extends to trusts.").
>
> If July Thirtyfirst is an entity separate from Norman Rhodes, it must appear in this case through counsel. **<u>Johnson has not demonstrated that he is a licensed attorney admitted to practice before this court</u>**.

(ECF No. 21, PageID.113–114 (emphasis added).) Accordingly, the Court does not consider Johnson's objection in deciding the motion for summary judgment.

Rhodes was its owner and "main salesman," and he participated in producing art for customers. (*Id.* at PageID.798 at 38–40.) Rhodes filed annual corporate tax returns for the business. (*Id.* at 38.) He also oversaw the withholding of federal tax from his employees' wages. (*Id.* at 38–39.) Rhodes later bought "D & G Sign Company," another Michigan corporation. (*Id.* at PageID.797–798 at 35, 39.) The business filed corporate tax returns while Rhodes owned it, and he oversaw its tax withholding. (*Id.* at PageID.798 at 40–41.) Rhodes also annually filed his own individual income tax returns, which included reporting his income from the Rhodes Graphics and D & G Sign Company businesses. (*Id.* at PageID.798–799 at 41–42.)

In the 1990s, Rhodes met Brent Emory Johnson ("Johnson") at events where Johnson was a presenter. (*Id.* at PageID.794 at 22–24.) Johnson's presentations concerned trusts and what Johnson saw as a distinction between "statutory" and "non-statutory" trusts, with the latter at times referred to as "pure trust organizations" ("PTO"). (*Id.* at PageID.794–795 at 25–26, PageID.816 at 110.) After attending the presentations, Rhodes formed the belief that a PTO is a "non-statutory

contractual entity" extrinsic to state law and exempt from governmental regulation. (*Id.* at PageID.795 at 26–27, 29.)

Johnson runs a website called "The Voice of Freedom." (ECF No. 51, PageID.443.) He posts articles advertising PTOs on the website. (ECF Nos. 79-3, 79-4.) Johnson markets the PTO arrangement as a means "by which an ordinary Citizen can protect his or her property from the bureaucratic vultures inhabiting all levels of our government[,]" serving to "guarantee protection of your assets from attachment by the IRS, the federal government, etc." and allowing one "to divest yourself of legal control while maintaining practical control of the assets in question." (ECF Nos. 79-3, 79-4 at 1–2.)

Johnson's website represents that "[a] common law Pure Trust Organization, sometimes called a True Trust or Unincorporated Contractual Organization (UCO), gets its existence from fundamental law which pre-dates American legislative statute, and is thereby exempt from regulation by legislative statute." (ECF No. 79-4 at 1.) He advertises that "[a] PTO provides protection from taxation, liability, probate, and government regulation[,]" and that "[p]roperty held in a PTO is free from liens, levies, taxes and regulations imposed by federal or State

government agencies." (*Id.* at 11.) Johnson also advertises PTOs as vehicles to house a business, "hir[ing] you as General Manager[,]" and having a "bank account set up to require two signatures: the Fiduciary Owner (required on all PTO accounts) and the General Manager." (*Id.* at 2.) According to Johnson, "[y]ou do not have legal control because you alone cannot access funds, but neither does the Fiduciary Owner have the ability to access funds directly[,]" allowing the purchaser of the PTO package to "maintain practical control." (*Id*). Thus, he writes, "if an IRS agent ever visits you at your work place, you can honestly tell him, 'I just work here, go talk to the owner.'" (*Id.*)

During the mid-1990s, Rhodes was "searching for liability protection for his personal property," and "Mr. Johnson taught [him] the remedy of trusts as a vehicle for liability protection." (ECF No. 79-5, Response to Interrogatory No. 9.) Rhodes closed D & G Sign Company and began manufacturing and installing signs under the name "Signmaker" and began providing advertising agencies with custom graphics and printing services under the name "Graphic Associates." (ECF No. 79-1, PageID.799–800 at 42, 44–46; ECF No. 81, PageID.1403.)

Rhodes states that Signmaker and Graphic Associates are "common law" trusts, not "statutory trusts." (ECF No. 79-1, PageID.800 at 46–47.) Rhodes determined that conducting business through Signmaker and Graphic Associates would better protect him from civil liability than conducting business as an outright owner, as he had through the Rhodes Graphics and D & G Sign Company corporations. (*Id.* at PageID.855 at 267–268.)

Rhodes testified that Johnson was the "fiduciary owner" of Signmaker, and Rhodes its "general manager." (*Id.* at PageID.800 at 47, PageID.840 at 209, PageID.850 at 249.) According to Rhodes, both men were the sole occupants of those respective roles since Signmaker's inception. (*Id.* at PageID.850–851 at 247, 249–250.) Rhodes ran Signmaker's day-to-day business. (*Id.* at PageID.851 at 250.) He oversaw customer communications, contractor payments, and product creation. (*Id.* at 250–252.) He was the only one in charge of hiring or firing decisions, maintaining books and records, and supply logistics. (*Id.* at PageID.851–852 at 250, 252, 254.) Johnson did not hire, fire, or pay contractors of Signmaker, locate new customers, keep books and records,

procure supplies, make products, or review its books and records. (*Id.* at 250, 254.)

Rhodes and Johnson participated in setting Rhodes' compensation as Signmaker's general manager, and the business was Rhodes' "main source of income." (*Id.* at PageID.796 at 31, PageID.852 at 256–257.) Rhodes paid himself directly from a bank account opened under the name "Signmaker." (*Id.* at PageID.852 at 256; ECF No. 79-15, Ex. C.) Withdrawals from the Signmaker bank account required Johnson's approval, and Rhodes testified that he could not recall an instance where Johnson refused to approve a check, but if they discussed what Rhodes surmised was a discretionary payment and Johnson did not agree to the payment, he would not write a check. (ECF No. 79-1, PageID.845 at 228; ECF No 81-2, PageID.1439 (Rhodes' Declaration at ¶25).) Rhodes did not know of any instance where Johnson paid himself from the Signmaker bank account or withdrew financial value from the business. (ECF No. 79-1, PageID.853 at 260.)

Rhodes likewise testified that Johnson was the "fiduciary owner" of Graphic Associates, and Rhodes its general manager and only purported employee. (ECF No. 79-1, PageID.800 at 47, PageID.839–840 at 203,

209.) Rhodes oversaw day-to-day operations of the Graphic Associates business, and he was in charge of customer communications, finding new customers, supply logistics, and making products. (*Id.* at PageID.839–840 at 203, 208, 209, PageID.843 at 221.) He was Graphic Associates' "main person." (*Id.* at PageID.841 at 210.) Johnson's responsibility with respect to Graphic Associates was to sign checks; he did not make products for the Graphic Associates business or interact with or solicit customers. (*Id.* at PageID.840–841 at 209–210.) As Rhodes testified, Johnson's role was to "sign[] the checks" drawn on a bank account opened under the name "Graphic Associates," which checks Rhodes approved. (*Id.* at PageID.841 at 210.) Rhodes, his wife (defendant Jeannie K. Parker-Rhodes), and Johnson had signature authority for the Graphic Associates bank account. (*Id.* at PageID.841 at 225; ECF No. 79-8.)

Rhodes determined his own compensation as general manager of Graphic Associates and paid himself through checks drawn on the Graphic Associates bank account. (ECF No. 79-1, PageID.840 at 206–207; ECF No. 79-15, Ex. F.) Rhodes wrote checks from the Graphic Associates bank account to Signmaker to provide Signmaker with financial support. (ECF No. 79-1, PageID.847 at 234–235.) Rhodes testified that he could

not recall any instance in which Johnson refused to approve a Graphic Associates check. (*Id.* at PageID.845 at 228.) Rhodes did not know of any instance in which Johnson, the "trustee" of Graphic Associates, paid himself a salary from the Graphic Associates business, made a withdrawal from the business bank account, or received value from the business. (*Id.* at PageID.843–844 at 220, 221, 223.)

In 1998, Rhodes claims he established a PTO called "July ThirtyFirst" to "bargain, assign, convey, exchange and deliver … all rights, title and interest in" the Real Property, which was the Rhodes' personal residence, to July ThirtyFirst for "twenty-five dollars of silver and Certificates of Evidence of Right of Distribution comprising a total of 100 units, and other good and valuable consideration[.]" (*Id.* at PageID.813 at 100, PageID.817 at 117; ECF No. 79-11, PageID.1043, 1051.) The Rhodes had purchased the Real Property for $150,000 in 1992. (ECF No. 79-12.) Rhodes asserts that, based on the assignment of the Real Property to July ThirtyFirst, Jeannie K. Parker-Rhodes does not claim any interest in the Real Property. (ECF No. 9, PageID.37 at ¶ 4.)

The organizational document for July ThirtyFirst expressly states that no "Fiduciary Owners," "officers," or "Certificate holders" of July

ThirtyFirst, whether "present or future," would "have or possess any beneficial interest in the property or assets" of July ThirtyFirst. (ECF No. 79-11, PageID.1044.) It further provides that "[o]wnership of Certificates" of July ThirtyFirst "shall not entitle the holder to any legal or equitable title in or to" its property. (*Id.* at PageID.1049.) Neither Rhodes nor Jeannie K. Parker-Rhodes "holds any Beneficial Interest in July ThirtyFirst[.]" (ECF No. 13, PageID.62 at ¶ 18.)

July ThirtyFirst's organizational document also provides that: (1) "[t]his Contract is formed under the Common Law of Contracts and protected by Article I, Section 10 of the Constitution for the [U]nited States, and is not formed under the trust laws of any state[,]" and (2) July ThirtyFirst was "intended to be operated within Common Law as a body of Private Law that is created between men without any benefit derived from the State, and is only created out of their private contracts, and no other body of law." (ECF No. 79-11, PageID.1044, 1050.) That document also provides that "[t]he Fiduciary Owner(s) shall have exclusive power to construe the meaning and intent of this Contract and the Fiduciary Owner(s)' construction shall be conclusive, legally binding and will

govern." (*Id.* at PageID.1046.) Johnson claims to be the fiduciary owner of July ThirtyFirst. (ECF No. 13, PageID.61 at ¶ 2.)

Rhodes has not filed a federal income tax return since 1997. (ECF No. 79-14, PageID.1114 at ¶ 9.) The IRS has no record of any return filed by or on behalf of "Signmaker," "Graphic Associates," or "July ThirtyFirst." (*Id.* at PageID.1115 at ¶ 10.) IRS Agent Nathaniel Reda ("Reda") examined – or "audited" – Rhodes' unreported federal income tax liabilities for the 2003-2008 tax years. (ECF No. 79-15, PageID.1158 at ¶ 2.) As part of his examination, Reda contacted Rhodes regarding Rhodes' unfiled returns, and afforded Rhodes several opportunities to provide an explanation or records, to aid the examination. (*Id.* at PageID.1178–1179 at ¶¶ 3–6; ECF No.79-16, PageID.1353–1354 at 173–177.) Rhodes did not provide Reda with any explanation or records. (*Id.*)

After Rhodes failed to appear pursuant to an IRS summons to appear at an interview to provide testimony and records to the IRS for the examination, the United States sued to enforce that summons. *See United States v. Rhodes*, No. 2:09-mc-50023 (E.D. Mich.) Rhodes responded to the summons-enforcement petition with several arguments. *See id.*, ECF No. 4, PageID.24 at ¶ 6b (Rhodes never "entered into any

agreement … to establish joinder or binder between himself and the Internal Revenue Service”), ¶ 13 (Rhodes “is not a United States citizen under the Fourteenth Amendment”), PageID.25 at ¶ 23 (Rhodes “never … agreed to be subject to the jurisdiction of the IRS” and he “does not fall within the purview of 26 USC”). The court enforced the IRS summons. *See id.*, ECF No. 6.

Rhodes then appeared for an IRS examination, but he asserted his Fifth Amendment right against self-incrimination and declined to answer the IRS's inquiries. (ECF No. 79-15, PageID.1160 at ¶¶ 9–11; ECF No. 79-16, PageID.1354 at 177.) Rhodes also never provided Reda with any records during Reda's examination of Rhodes' 2003–2008 tax years, and Rhodes failed to maintain books and records sufficient to establish the amount of his gross income. (ECF No. 79-15, PageID.1160 at ¶¶ 12–13; ECF No. 79-16, PageID.1354–1355 at 177–178.)

During the examination, Reda issued document summonses to Fifth Third Bank for records of accounts associated with “Signmaker” and “Graphic Associates.” (ECF No. 79-15, PageID.1160–1162 at ¶¶ 13–15, 20.) Fifth Third Bank produced numerous records of the bank accounts of Signmaker and Graphic Associates in response to the

summonses, including statements and copies of checks signed by, or payable to, Rhodes. (*Id.* at PageID.1161–1163 at ¶¶ 16–19, 21–23.) Reda performed a bank deposits analysis of the Fifth Third Bank records. (*Id.* at PageID.1164 at ¶ 27.) Pursuant to that analysis, Reda segregated all deposits into the accounts that were known or likely to be non-revenue in nature (e.g., refunds, inter-account transfers). (*Id.* at PageID.1164–1165 at ¶ 29; ECF No. 79-16, PageID.1320–1321 at 41–43.) After subtracting the segregated amounts, Reda considered all remaining deposits as income to Rhodes. (ECF No. 79-15, PageID.1164–1166 at ¶¶ 29, 31–32.)

Based on the bank deposits analysis, the IRS determined that the Signmaker business had taxable income for the 2003 through 2008 tax years of $127,660.06, $74,600.10, $54,900.15, $38,129.25, $51,992.47, and $31,519.85, respectively, and the Graphic Associates business had taxable income for those same tax years of $18,600.00, $15,085.00, $54,215.00, $31,405.00, $10,185.00, and $6,225.00, respectively, all of which Reda attributed to Rhodes. (ECF No. 79-15, PageID.1165–1166 at ¶ 31.) These determinations were reflected in an IRS Form 4549-A, "Income Tax Discrepancy Adjustments," dated September 16, 2010. (*Id.* at PageID.1166 at ¶ 32.)

Based on the taxable income reflected in the Form 4549-A, the IRS determined that Rhodes had income tax deficiencies of $46,161.00, $28,404.00, $34,874.00, $20,426.00, $17,465.00, and $8,851.00, for the 2003 through 2008 tax years, respectively, along with penalties under 26 U.S.C. §§ 6651(a)(2), 6651(f), and 6654. (*Id.* at PageID.1166–1167 at ¶¶ 33–37; ECF No.79-17.) The IRS subsequently assessed the deficiencies and penalties (ECF No. 79-14, Exs. 1–6), which assessments automatically gave rise to tax liens for those liabilities as of the dates of the assessments. 26 U.S.C. §§ 6321, 6322. The government also filed a Notice of Federal Tax Lien in accordance with 26 U.S.C. § 6323(f). (*See* ECF No. 104, PageID.1999.)

Following the foregoing assessments, the IRS sent Rhodes notice of the liabilities and demanded their payment (ECF No. 79-14, PageID.1113 at ¶ 5.) As of October 2, 2024, the IRS has determined that Rhodes' income tax liabilities for the periods ending December 31, 2003 through December 31, 2008 total $641,669.67, which includes all unpaid federal income taxes, penalties, and interest, after taking into account all accruals, costs, payments, credits, and abatements. (ECF No. 79-14, PageID.1113.)

## III. LEGAL STANDARDS

The Federal Rules of Civil Procedure provide that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In

such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322–23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

A plaintiff faces a "substantially higher hurdle" on a motion for summary judgment. *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). When the defendant is the non-moving party and has no burden of proof, it needs only show that the opponent cannot sustain his burden at trial. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) ("But where the moving party has the burden . . . his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party[.]"). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (citations omitted).

Moreover, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of

different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## IV. ANALYSIS

### A. Count I – Income Tax Liabilities

It is undisputed that Rhodes did not file tax returns for the relevant years, i.e., the 2003–2008 tax years. Accordingly, the IRS is entitled to summary judgment on its claim that Rhodes is liable for any taxes that that were properly assessed against him for those tax years. For the reasons that follow, the Court concludes that there is no genuine dispute of material fact: (a) that Rhodes' taxable income for the 2003–2008 tax years includes the taxable income attributable to Signmaker and Graphic Associates, or (b) as to the tax amounts for which Rhodes is liable for the 2003–2008 tax years.

It is undisputed that Rhodes refused to answer any questions at the IRS examination when he instead invoked his Fifth Amendment right

against self-incrimination. It also is undisputed that Rhodes refused to provide the IRS with his books and records, including the books and records of Signmaker and Graphic Associates for the relevant years. The IRS therefore summonsed the bank records of Signmaker and Graphic Associates, and it utilized the "bank deposit" method to reconstruct Rhodes' income for those years. *See Clayton v. Comm'r*, 102 T.C. 632, 645 (1994); *Woods v. Comm'r*, 929 F.2d 702 (Table), 1991 WL 43917, at *2 (6th Cir. 1991) ("The bank deposit method of income accounting has been accepted in this Circuit."). The bank deposit method "assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income," but "the Government must take into account any nontaxable source or deductible expense of which it has knowledge." *Id.* at 645–646; *see also Kearns v. Comm'r*, 979 F.2d 1176, 1177 (6th Cir. 1992). As of April 8, 2011, the IRS determined that Rhodes owed $149,581.00 in unpaid taxes for the tax years 2003–2008, plus $153,746.64 in penalties and interest (ECF No. 79-17), an amount that, as of October 2, 2024, totaled $641,669.67 in unpaid federal income taxes, penalties, and interest. (ECF No. 79-14, PageID.1113.)

"An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes. **It is well established in the tax law that an assessment is entitled to a legal presumption of correctness—a presumption that can help the Government prove its case against a taxpayer in court**." *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002) (emphasis added). Rhodes does not challenge the appropriateness of the IRS relying on the bank deposit method or the legal presumption of correctness. (ECF No. 81, PageID.1410.) Accordingly, in this case, the IRS is entitled to a legal presumption of correctness that, as of April 8, 2011, Rhodes owed $149,581.00 in unpaid taxes, plus $153,746.64 in penalties and interest.

To overcome the legal presumption of correctness, Rhodes bears the burden of: (1) "producing credible evidence that [he] did not earn the taxable income attributed to [him] or, (2) "presenting an argument that the IRS deficiency calculations were not grounded on a minimal evidentiary foundation." *United States v. Walton*, 909 F.2d 915, 919 (6th Cir. 1990). Where, as here, a taxpayer has failed to maintain adequate records as to the amount and source of his income, and the IRS has determined that the deposits are income, **the taxpayer has the burden**

**<u>of showing that the determination is incorrect</u>**. *See* Rule 142(a), Tax Court Rules of Practice and Procedure; *Marcello v. Comm'r*, 380 F.2d 494, 497 (5th Cir. 1967); *Hoefle v. Comm'r*, 114 F.2d 713, 714 (6th Cir. 1940). In other words, Rhodes has the burden of showing that the IRS's determination was incorrect.

The IRS is not required to prove that all the deposits are income. *Albert Gemma*, 46 T.C. 821, 833 (1966). The burden of showing duplications is on the taxpayer. *Pearl Zarnow*, 48 T.C. 213, 216 (1967). *See also Est. of Mason v. Comm'r of Internal Revenue*, 64 T.C. 651, 657 (1975), *aff'd sub nom. Est. of Mason v. Comm'r*, 566 F.2d 2 (6th Cir. 1977).

Rhodes concedes that the IRS's computation of the taxable income of Signmaker and Graphic Associates is accurate (ECF No. 81, PageID.1407 at ¶¶60–61), but he contests that any income of Signmaker or Graphic Associates is attributable to him. (ECF No. 81, PageID.1407–1408 at ¶¶ 60, 61.) Rhodes argues that the government fails to provide incontrovertible evidence that Rhodes owned, principally controlled, or benefitted from the Signmaker and Graphic Associates bank accounts, i.e., he claims he is not liable for the income generated by those two "entities." He further argues that, on summary judgment, conflicting

interpretations of the same evidence must lead to denial of the motion. (ECF No. 81, PageID.1411 (citing *Gentry v. County of Wayne*, 501 F. App'x 475, 477 (6th Cir. 2012) ("Resolution of differing factual accounts and credibility determinations are entrusted to the finder of fact."); *Anderson*, 477 U.S. at 255 ("the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge")).) He contends that should be the result here, but he fails to make a record of how he did not own, principally control, or financially benefit from Signmaker and Graphic Associates.

Rhodes challenges Reda's declaration that, "Based on my review of the checks from the Signmaker and Graphic Associates accounts, including checks payable to Mr. Rhodes individually, or for ostensibly personal expenses of Mr. Rhodes (e.g., the checks to SEMCO Energy, DTE Energy, North Hills Veterinary Hospital, Blue Cross Blue Shield, and the Harsens Island St. Clair Flats Association), I concluded that the bank accounts belonged to Mr. Rhodes." (ECF No. 81, PageID.1411 (citing ECF No. 79-15, PageID.1164 at ¶ 26).)

Rhodes asserts that this statement simply reflects Reda's *opinion* that Rhodes owned both the Signmaker and Graphic Associates bank

accounts. Rhodes maintains that Reda is only able to link Rhodes to the payments to SEMCO Energy and DTE, but Rhodes testified at his deposition those payments were made only because those utility companies did not allow him to open an account in any name other than his own. (ECF No. 81, PageID.1412 (citing ECF No. 79-1, PageID.835–836).)

Rhodes attaches a declaration to his response brief[3] that contains plausible explanations with respect to several other checks written from Signmaker or Graphic Associates bank accounts, including those to North Hills Veterinary Hospital, All-Ways Dry, Blue Cross Blue Shield, Holy Cross Church, and the Harsens Island St. Clair Flats Association. (*See* ECF No. 81, PageID.1412–1415 (citing ECF No. 81-2 at ¶¶ 13, 16,

[3] In a footnote in its reply brief, the IRS argues that the declaration is not admissible for purposes of summary judgment because it bears only a purported electronic signature. (*See* ECF No. 85, PageID.1509 n.2 (citing *Williams v. Mastronardi Produce, Ltd.*, No. 23-13302, 2024 WL 3908718, at *5 (E.D. Mich. Aug. 22, 2024).) Although the *Williams* court found a declaration deficient due to the absence of a signature, it did not specifically exclude the declaration on that basis. *See* 2024 WL 3908718, at *5 (citing, among other cases, *Blount v. Stanley Engineering Fastening*, 55 F.4th 504, 515 (6th Cir. 2022) (affidavit submitted by the plaintiff "was not a proper declaration under 28 U.S.C. § 1746 because it was unsworn and filed with [the plaintiff's] electronic signature rather than his personal signature.")). The Court concludes that it need not address the issue in this case. Instead, for the reasons discussed herein, the Court finds that, even if Rhodes' purported declaration was properly signed, the statements in Rhodes' declaration are insufficient to create a genuine issue of material fact with respect to the issues before the Court.

18, 19, 20).) Rhodes likewise offers an explanation why checks made out to him were deposited in the Signmaker or Graphic Associates accounts. He stated that sometimes occurred when customers of those two trusts made checks payable to Rhodes directly, and he deposited them in the business accounts because it was for work done by those entities. (ECF No. 82-1, PageID.1436 at ¶ 20.)

However, since Rhodes refused to provide any information to Reda, including by invoking the Fifth Amendment at the IRS examination and failing to produce any documents pursuant to the IRS's summons to him, he cannot challenge those issues now. *See United States v. Rahman*, No. CV 18-10530, 2020 WL 1915692, at *8 (E.D. Mich. Apr. 20, 2020) (citing *Dunkin' Donuts, Inc. v. Taseski*, 47 F. Supp. 2d 867, 872–873 (E.D. Mich. 1999)) ("in a civil case, once a litigant invokes the Fifth Amendment privilege on an issue, he is barred from introducing other evidence on that issue."). That is because Rhodes may not use the Fifth Amendment during a deposition, and then submit "affidavits in opposition to the government's motion for summary judgment" as to issues about which he refused to answer. *U.S. v. Sixty Thousand Dollars in U.S. Currency*, 763 F. Supp. 909, 914 (E.D. Mich. 1991)). Similarly, "[a] litigant may not

invoke the Fifth Amendment to avoid answering questions in discovery, and then cry foul when the absence of evidence in favor of the litigant requires summary judgment to be entered against him." *United States v. $110,873.00 in U.S. Currency*, 159 F. App'x 649, 652–653 (6th Cir. 2005)).

More significantly, Rhodes does not offer, whether in his declaration or otherwise, any evidence that he was not the owner of Signmaker or Graphic Associates or that any income from Signmaker or Graphic Associates was not attributable—and taxable—to him. Rhodes does not offer any evidence that Signmaker or Graphic Associates was owned by someone other than him.

In his response brief, Rhodes offers conclusory statements that Johnson was the "fiduciary owner" of the Signmaker and Graphic Associates trusts, while Rhodes was simply the general manager of them. Rhodes did testify that Johnson was the "fiduciary owner" of both Signmaker and Graphic Associates. (ECF No. 79, PageID.767 at ¶ 16; ECF No. 81, PageID.1403 at ¶ 16; ECF No. 79-1, PageID.800 at 47, PageID.840 at 209, PageID.850 at 249.)[4] Despite that testimony, Rhodes

[4] As reflected in his pleadings and testimony, Rhodes consistently has asserted that Signmaker and Graphic Associates are trusts. (*See, e.g.*, ECF No. 79, PageID.767 at ¶ 14 ("Signmaker and Graphic Associates are purported 'common law' trusts, not 'statutory trusts.'") and ECF No. 81, PageID.1403 at ¶ 14 ("Admitted."); ECF No.

could not identify at his deposition—nor does he do so in his response brief—any payments, compensation, or other income of Signmaker or Graphic Associates that was paid to Johnson. (*See* ECF No. 79, PageID.768 at ¶ 21 ("Mr. Rhodes did not know of any instance where Mr. Johnson paid himself from the Signmaker bank account or withdrew financial value from the business.") and ECF No. 81, PageID.1404 at ¶ 21 ("Admitted."), ECF No. 79-1, PageID.852 at 260; ECF No. 79, PageID.770 ¶ 33 ("Mr. Rhodes did not know of any instance in which Mr. Johnson paid himself a salary from the Graphic Associates business, made a withdrawal from the business bank account, or received value from the business.") and ECF No. 81, PageID.1405 at ¶ 33 ("Admitted, but there is no basis for Mr. Johnson, as trustee, to pay himself a "salary" or "receive[] value from the business."), ECF No. 79-1, PageID.843 at 221, 223.) Rhodes also does not identify at any time any payment(s) made to any other person affiliated with Signmaker or Graphic Associates.[5]

---

79-1, PageID.800 at 46–47 ("Q. . . . both Graphic Associates and Signmaker are common law trusts, correct? A. Yes.").)

[5] Even if the evidence supported Rhodes' conclusory statements regarding Johnson's ownership (and, as stated above, there is no evidence to support that Johnson had any ownership of either Signmaker or Graphic Associates), that would not be sufficient. *See, e.g.*, *Mason*, 64 T.C. at 658 ("A petitioner cannot refuse to cooperate with the agent conducting a tax investigation and then claim that the

Rhodes' theory that Johnson was the "fiduciary owner" of Signmaker and Graphic Associates is puzzlingly inconsistent with another argument in his response brief, as Rhodes also asserts that there is no "owner" of a trust for purposes of taxation of the income of that trust. (*See* ECF No. 81, PageID.1404.)

Finally, as to control of Signmaker and Graphic Associates, Rhodes acknowledged that: (a) Rhodes, not Johnson, handled all day-to-day operations of both Signmaker and Graphic Associates; (b) Rhodes at least participated in setting his compensation to be paid from each entity; (c) the Signmaker business was Rhodes' "main source of income"; and (d) Rhodes was "the main person" for Graphic Associates. (ECF No. 79, PageID.767–769 at ¶¶ 17, 18, 27, 28, PageID.841 at 210; ECF No. 81, PageID.1403, 1405 at ¶¶ 17, 18, 27, 28; ECF No. 79-1, PageID.851–852 at 250–252, 254.)

Moreover, Rhodes admits that he was compensated from the Signmaker bank account and the Graphic Associates bank account. (*See* ECF No. 79, PageID.768 at ¶ 19 (Rhodes "paid himself directly from a

---

resulting determination by the Commissioner was arbitrary when the agent acted reasonably, taking into consideration the information available to him").

bank account opened under the name "Signmaker."), ECF No. 81, PageID.1404 at ¶ 19 (Rhodes did not contest the foregoing statement) and ECF No. 79-1, PageID.852 at 256 ("Q. And you paid yourself out of Signmaker's bank accounts? A. Yes."); ECF No. 79, PageID.770 (Rhodes "paid himself through checks drawn on the Graphic Associates bank account."), ECF No. 81, PageID.1405 at ¶ 30 ("Admitted."), and ECF No. 79-1, PageID.840 at 206–207 ("Q. You decide how much to pay yourself out of Graphic Associates bank account? A. Yes.").)

For the above reasons, the Court finds that there is no evidence that Signmaker and Graphic Associates were owned by someone other than Rhodes or that the taxable income from Signmaker and Graphic Associates is attributable to Rhodes.

The IRS's assessments against Rhodes included penalties under § 6651(f). Such penalties are based on the premise that "failure to file any return is fraudulent," § 6651(f), and "serve[] only to increase the percentages taken into account in determining" the addition to tax under § 6651. *Mohamed v. Comm'r*, T.C. Memo. 2013-255, 2013 WL 5988943, at *9 (2013). To support the imposition of such a penalty, the government must show an "underpayment" and the taxpayer's "fraudulent intent."

*Scenic Trust. v. Comm'r*, T.C. Memo. 2024-85, 2024 WL 4057450, at *16 (2024).

An underpayment may be shown by proof of "a likely source of the unreported income." *Parks v. Comm'r*, 94 T.C. 654, 661 (1990). Fraudulent intent can be demonstrated by "badges of fraud," including: (1) failure to file tax returns; (2) failure to report income over an extended period; (3) failure to cooperate with or furnish the IRS with access to records; (4) failure to keep adequate books and records; (5) concealment of bank accounts or assets from IRS agents; (6) willingness to defraud another in a business transaction; (7) implausible or inconsistent explanations of behavior or arguments; (8) failure to make estimated tax payments; and (9) engaging in illegal activities. *See, e.g., Belcik v. Comm'r*, T.C. Memo. 2024-49, 2024 WL 1716997, at *10 (2024).

In this case, Rhodes does not address the issue of the § 6651(f) penalty, and the Court finds that its imposition is supported by the undisputed record. There is no material dispute that Signmaker and Graphic Associates were sources of Rhodes' income, which income went unreported because he failed to file tax returns after 1997. There also is no genuine dispute that Rhodes: (a) failed to maintain adequate records,

(b) refused to cooperate with the IRS, and (c) asserted meritless arguments and objections to the tax laws in the form of the PTOs. Nor is there any dispute that Rhodes failed to report any income for years or that he concealed his assets from the IRS via the PTOs. All these badges support the imposition of the § 6651(f) penalties. *Belcik*, 2024 WL 1716997, at *10. In addition, as Rhodes paid personal income taxes and taxes on behalf of two different corporations in the 1980s and 1990s (Rhodes Graphics and D & G Sign Company), there is no question that Rhodes was aware of and familiar with the requirement that he had to file federal income tax returns and pay taxes on his income.

As no genuine dispute of material fact exists regarding Rhodes' liabilities to the IRS for the 2003–2008 federal income tax years, the Court **GRANTS** the government's motion for summary judgment as to Count I.

### B. Count II – Enforcement of Federal Tax Liens Against Real Property

After notice and demand to Rhodes of the tax assessments at issue, "a lien in favor of the United States" attached to "all property and rights to property, whether real or personal" of Rhodes. 26 U.S.C. § 6321. In

Count II, the government now seeks a court order to enforce its federal tax lien against the Real Property.

The government argues that: (1) July ThirtyFirst, which allegedly currently owns the Real Property, is a sham trust; (2) the Real Property is truly owned by Rhodes; and (3) the government can enforce its lien against the Real Property. The government's primary contention is that July ThirtyFirst has no beneficiary, although it also suggests that July ThirtyFirst has no trustee, corpus, or assets.

In their response brief, defendants argue that Signmaker and Graphic Associates were trusts created under Michigan law, M.C.L. § 700.7101 et seq., as a trust "may be created by . . . [a] [t]ransfer of property to another person as trustee during the settlor's lifetime." M.C.L. § 700.7401(a). They note that Michigan law provides that:

> A trust is created only if all of the following apply: (a) The settlor has capacity to create a trust. (b) The settlor indicates an intention to create the trust. (c) The trust has a definite beneficiary[.] (d) The trustee has duties to perform. (e) The same person is not the sole trustee and sole beneficiary.

*Id.* § 700.7402(1).

The modern Restatement defines a trust as "a fiduciary relationship with respect to property, arising from a manifestation of

intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee." Restatement (Third) of Trusts, § 2 (2003).

The government first notes that, when creating July ThirtyFirst, Rhodes and Johnson believed that the July ThirtyFirst PTO was exempted from regulation by the state, even though "trusts are creatures of state law" that must derive their existence from local law. *Skiba v. Laher (In re Laher*), 496 F.3d 279, 288 (3d Cir. 2007). The government argues that July ThirtyFirst cannot be a trust under Michigan law, as the trust document expressly states, "This PTO is intended to be operated within Common Law as a body of Private Law that is created between men without any benefit from the State, and is only created out of their private contracts, and no other body of law." (ECF No. 79-11, PageID.1050.) However, the Court finds that despite the statement of intent, the Court must determine whether July ThirtyFirst satisfied the necessary elements of a trust under Michigan Law.

The government correctly observes, however, that Rhodes testified that July ThirtyFirst had no beneficiary, which is a requisite element of

a trust under Michigan law. *See* M.C.L. § 700.7402(1)(c). (ECF No. 79-1, PageID.826 at 152 ("Q. Does the July Thirtyfirst trust have beneficiaries? A. No. Not to my knowledge, beneficiaries, no. No. it doesn't. It has certificate holders, I believe. Q. But that's different from a beneficiary of a trust. A. Yes. Q. So your testimony is that July Thirtyfirst has no beneficiaries? A. Correct. Q. Has it ever? A. I don't know. Not to my knowledge.").)

Defendants contend that July ThirtyFirst's "Certificate Holder," Stephanie Barrett, was a beneficiary of July ThirtyFirst. (*See* ECF No. 81, PageID.1417 (citing ECF No. 79-11, PageID.1052).) Defendants argue that a "certificate holder" in connection with a land trust is defined as "the holder [of] a share of the benefits of property ownership, while the trustee retains legal title." Black's Law Dictionary 2567 (8th ed.2004). (*See also* ECF No. 81, PageID.1417 (citing *Main-Hammond Land Trust v. Comm'r,* 200 F.2d 308, 312 (6th Cir. 1952) (referring to "certificate holders or beneficiaries" interchangeably); *LBCMT 2007-C3 East 8 Mile Rd., L.L.C. v. Guttman*, 2017 WL 9732029, at *2 (E.D. Mich. July 20, 2017) (describing a common law trust with "certificate holders" as beneficiaries); *In re Estate of Donald Matusinski v. Gregory Pelgus*, 2007

WL 1934791, at *2 (Mich. Ct. App. July 3, 2007) ("The creation of a trust does not depend upon the use of a particular form of words, but it may be inferred from the facts and circumstances of the case.") (citation omitted); *Knights of Equity Memorial Scholarships Com. v. Univ. of Detroit*, 359 Mich. 235, 239 (1960) (affirming finding that parties formed a trust despite not using words like "trust" or "trustee").)

The Court finds that a July ThirtyFirst certificate holder cannot be a definite beneficiary under Michigan law. The July ThirtyFirst organizational document states that one's status as a certificate holder "shall not entitle the holder to any legal or equitable title in or to" the Real Property. (ECF No. 79-11, PageID.1049.) As defendants recognize, it is "a correct statement of the law that beneficiaries have no claim to possession of the trust's property, only the right to benefit from the trustee's management of that property." (ECF No. 81, PageID.1418 (citing *JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 750 (6th Cir. 2019)).) As the *Winget* court held, however, "[i]n most cases, a 'trustee' holds the legal title (i.e., the power to manage the trust property) on behalf of **<u>a 'beneficiary,' who holds the equitable title</u>** (i.e., the right to benefit from the trust property)." *Id.* (emphasis added).

Significantly, July ThirtyFirst's organizational document expressly provides that a certificate holder is not "entitle[d] . . . to any legal or equitable title in or to" the Real Property (ECF No. 79-11, PageID.1049) or otherwise hold any "beneficial interest" in the Real Property. (*Id.* at PageID.1044.) The Court therefore finds as a matter of law that no person, simply by virtue of being a "certificate holder" of July ThirtyFirst (including Stephanie Barrett), could be a definite beneficiary of July ThirtyFirst. M.C.L. §§ 700.7402(1)(c), 700.7103(1)(i).

For the foregoing reasons, the Court concludes that July ThirtyFirst has no definite beneficiary and cannot be a valid Michigan trust through which the Real Property could be or is held. Based on the Court's finding that July ThirtyFirst cannot hold the Real Property, the parties now stipulate that: (1) the government is entitled to summary judgment on Count II; (2) Rhodes and Parker-Rhodes each hold title to the Real Property; and (3) each of Rhodes and Parker-Rhodes owns 50% of the Real Property. (*See* ECF No. 79-12; ECF No. 104, PageID.2000.) Further, the parties agree that Parker-Rhodes is entitled to 50% of the net proceeds of a sale of the Real Property, measured after payment of the costs of the sale and payment of any local property taxes, if any, from

a judicial sale of the Real Property pursuant to 26 U.S.C. § 7403(c). (ECF No. 104, PageID.2000.)

For the reasons stated above, the Court finds that there is no genuine dispute of material fact that the United States is entitled to an order enforcing the federal tax liens against the Real Property to secure the liabilities described above, pursuant to 26 U.S.C. § 7403. The Court also finds that the government is entitled to summary judgment on Count II. Therefore, the Court orders that the entire Real Property be sold in a judicial sale (including by a receiver if requested by the United States), free and clear of all rights, titles, or interests of the parties, including any rights of redemption, with the proceeds of the sale distributed as follows: (a) first, to pay the costs of the sale, including any expenses incurred to secure and maintain the Real Property; (b) second, to defendant St. Clair County, Michigan, to pay any real estate taxes due and owing on the Real Property, for which St. Clair County is entitled to priority under 26 U.S.C. § 6323(b)(6); (c) third, 50% of any remaining amount to Parker-Rhodes, and (d) fourth, to the United States to pay Rhodes' income tax deficiencies described herein, except to the extent that the Court determines that another party has a superior claim, lien, or interest.

## V. JOHNSON'S OBJECTION TO JUDGE GRAND'S ORDER

On December 2, 2024, Magistrate Judge David R. Grand entered an order addressing two motions filed by Johnson. (*See* ECF No. 86.) On December 17, 2024, Johnson filed objections to Judge Grand's order. (*See* ECF No. 90.) In the filing, Johnson first asks, "Is Movant [Johnson] in contempt of court or not if he dissolves July Thirtyfirst?" (*Id.* at PageID.1535.) After citing a bankruptcy order regarding the disgorgement of fees, Johnson claims he "is not seeking 'legal advice.'" (*Id.* at PageID.1536.) Johnson then cites a Ninth Circuit case pertaining to judicial misconduct (*id.* at PageID.136–137) before stating,

> Movant is not asking the Court as to whether he should dissolve July Thirtyfirst or not, he is asking what the consequence of such an attempt would be and what the law is on the issues raised in his Motion.

(*Id.* at PageID.1537)

The Court finds that Johnson's objection is, in fact, a request for legal advice. He is asking the Court to render conclusions on what the law is on the issues raised in his motion and what the consequences of dissolving July ThirtyFirst would be. As even Johnson recognizes, the Court cannot give legal advice. For that reason, and because Johnson is not a party to this action, nor is he a licensed attorney acting on behalf of

any party to this action (including July ThirtyFirst), the Court **DENIES** the relief requested by Johnson.

## VI. CONCLUSION

Accordingly, **IT IS ORDERED** that the United States' motion for summary judgment (ECF No. 79) is **GRANTED**.

**IT IS FURTHER ORDERED** that the entire Real Property (3206 South Channel, Harsens Island, Michigan 48028) be sold in a judicial sale (including by a receiver if requested by the United States), free and clear of all rights, titles, or interests of the parties, including any rights of redemption.

**IT IS FURTHER ORDERED** that the proceeds of the sale be distributed as follows:

A. First, to pay the costs of the sale, including any expenses incurred to secure and maintain the Real Property;

B. Second, to defendant St. Clair County, Michigan, to pay any real estate taxes due and owing on the Real Property;

C. Third, 50% of any remaining amount to defendant Jeannie K. Parker-Rhodes, and

D. Fourth, to the United States to pay Rhodes' federal income tax deficiencies described herein.

**IT IS FURTHER ORDERED** that the Objections to Magistrate Judge David R. Grand's December 2, 2024 Order (ECF No. 90) are **DENIED**.

Judgment in favor of plaintiff United States will be entered separately.

**SO ORDERED.**

Date: January 22, 2025

s/Jonathan J.C. Grey
Jonathan J.C. Grey
United States District Judge

## **Certificate of Service**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 22, 2025.

**s/ S. Osorio**
Sandra Osorio
Case Manager